[Civil No. 1052.    Filed March 20, 1909.]

[100 Pac. 465.]

## THE ARIZONA COPPER COMPANY, LIMITED, a Corporation, Defendant and Appellant, v. WILLIAM ALLAN GILLESPIE, Plaintiff and Appellee.

1. NUISANCE—INJUNCTION—PERSONS ENTITLED TO SUE.—To authorize a private person to maintain an action to abate a public nuisance, he must show a special injury different in kind, and not merely in degree, from that suffered by the public generally.

2. NUISANCE—INJUNCTION—PERSONS ENTITLED TO SUE.—The owner of arid agricultural lands, having a right to use the water of a river for irrigation purposes, has such an interest in the water different from that of the general public as entitles him to maintain an action to restrain deposits of mineral debris in streams tributary to such river, which would render the water unfit for use.

3. WATERS AND WATERCOURSES—RIPARIAN RIGHTS.—Riparian rights do not exist in the territory of Arizona.

4. WATERS AND WATERCOURSES — RIGHT TO USE WATER — PRIORITY.— Under the doctrine of appropriation of water, he who is first in time is first in right, and so long as he continues to apply the water

to a beneficial use, subsequent appropriators cannot deprive him of the rights his appropriation gives, either by diminishing the quantity or deteriorating the quality.

5. NUISANCE—RESTRAINING LAWFUL BUSINESS—COMPARATIVE INJURIES. Where irreparable injury is being suffered, and will continue by the maintenance of a lawful business, relief by injunction against such business will not be withheld merely because the financial interests sought to be protected are small in comparison with those sought to be restrained.

6. WATERS AND WATERCOURSES—POLLUTION OF WATER—INJUNCTION— CONDITIONS ON GRANTING.—Where there is evidence, in an action to restrain a mining company from draining mineral debris from its copper concentrator into a river used by plaintiff for irrigation, that it would be practicable to drain debris into a settling basin near the river, plaintiff should not be required to construct such basins, but on granting the injunction, defendant should be permitted to construct and maintain the same at its own expense.

APPEAL from a judgment of the District Court of the Fifth Judicial District, in and for the County of Graham. Frederick S. Nave, Judge. Modified and affirmed.

## STATEMENT OF FACTS.

This action was brought by the appellee against the Shannon Copper Company, the Arizona Copper Company, Limited, and the Arizona Copper Company, to obtain an injunction restraining the defendants from depositing mining débris in streams tributary to the Gila river. It appearing to the plaintiff that the Shannon Copper Company had ceased to do the acts complained of, and that the Arizona Copper Company was not a proper party, the action was dismissed as to both these corporations, and prosecuted against the appellant corporation only. Testimony was taken in May, and the cause submitted and judgment rendered in November, 1907, enjoining the defendant from depositing any slimes, slickens, or tailings in the San Francisco river or Chase creek, in such manner that they may be carried into, or enter into, the waters of the Gila river. The facts found by the trial court are:

"That the Gila river rises in the territory of New Mexico, and flows hence through a generally mountainous country, through the county of Graham, and other counties, in the territory of Arizona, in a westerly direction into the Colo-

rado river at or near the city of Yuma, in the territory of Arizona. That the San Francisco river is an affluent of the said Gila river, emptying its waters into the said Gila river at or near the city of Clifton aforesaid, and above the head of the Montezuma and other canals, hereinafter described. That Chase creek is an affluent of the said San Francisco river, emptying its waters into the said San Francisco river above the city of Clifton. That each and all of said streams are public streams within the said county of Graham, and the waters thereof are applicable to the purposes of mining, irrigation, and domestic use. That the plaintiff is the owner and occupant of about two hundred and seventy-six acres of land in the Upper Gila Valley, near the town of Solomonville, and that said land is naturally desert and unproductive without the application of water thereon by irrigation. That the predecessors in interest of plaintiff in said land commenced the cultivation to valuable crops of portions of the same by means of water diverted from the Gila river through the Montezuma canal about the year 1872, and thereafter gradually increased the amount thereof so cultivated until, for more than fifteen years last past, the whole of said premises has been continually cultivated to valuable crops by means of said waters of the Gila river.

"That the said Montezuma canal, by and through which plaintiff diverts the water appropriated for use upon said land, as aforesaid, at all the times mentioned herein headed, and now heads, at a point upon the bank of said Gila river at or near the southwest corner of the NE. $\frac{1}{4}$ of the NE. $\frac{1}{4}$ of section 17, township 7 S., range 26 E., G. & S. R. B. & M., in said Graham county, at a distance of about twenty-five miles below the confluence of the said San Francisco river and said Gila river. That commencing at said head of the said Montezuma canal, and extending out into and across the said Gila river, was at all the times mentioned herein, and now is, maintained a dam for the purpose of diverting the waters of said Gila river into said canal. That said Montezuma canal is of a capacity sufficient to, and does, divert and carry three thousand inches of water, miners' measurement, from the said Gila river, and said canal extends out through the farming lands of the valley commonly known and called the 'Upper Gila Valley,' a distance of thirteen and one-half

miles, all within the said county of Graham. That said canal carries the public water of said Gila river for the irrigation of more than three thousand seven hundred and fifty acres of land to which said water was and now is appropriated, diverted, and applied by the owners and occupants thereof for agricultural purposes, and drinking and domestic uses in connection therewith, amongst others, to the lands of plaintiff. That said canal and dam is maintained by the owners of said lands and plaintiff, for the purposes and uses aforesaid.

"That in the said Upper Gila Valley and county of Graham, and from a point on said Gila river, at or near eighteen miles below the confluence of said San Francisco and said Gila rivers, to a point fifty-three miles below said last-named point, numerous irrigation ditches, amongst others said Montezuma canal, were taken out of said Gila river at various times in and since the year 1872 by divers persons who were then, and are now, the owners and occupants of irrigable lands lying upon either side of said Gila river, and by means of said ditches the public waters of said river have been ever since appropriated, diverted, and applied to the irrigation and cultivation of a constantly increasing quantity of irrigable lands so situated under said canals and occupied by persons entitled to the use of said waters, amongst others this plaintiff, until at the time of the institution of this suit more than twenty-three thousand acres of such lands were so irrigated and cultivated; and the said lands theretofore desert and unproductive, were reclaimed and were made to, and do now, produce alfalfa, grains, vegetables, melons, fruits, trees, and vines. That at all the times herein mentioned said ditches have been, and are now, maintained, and said public waters of said Gila river used upon the aforesaid land for the irrigation thereof, and the cultivation of valuable crops as aforesaid, and for domestic and drinking purposes in connection therewith. That as a result of the use of said public waters of said Gila river, as aforesaid, a rich and prosperous farming community has been established upon the lands aforesaid, supporting the towns of Solomonville, of Safford, of Thatcher and others, in all a community of more than eight thousand persons.

"That in the mountains through which the said Gila river and its affluents flow, in the neighborhood of the towns of Clifton, Morenci, and Metcalf, within the county of Graham, are large deposits of copper ore and that several large mining companies, including the defendant, the Arizona Copper Company, Limited, are engaged in the business of mining and reducing said ores. That mining operations on said deposits were commenced by miners about the year 1872, and have been continuously and increasingly prosecuted since that date, and that said mining industry and the farming industry in the Upper Gila Valley, in which is situated the town of Solomonville, were commenced about the same time and have each grown and increased in volume and importance to the present time. That the defendant, the Arizona Copper Company, Limited, is engaged in the reduction and treatment of copper ore in said mining district, near the upper branches and affluents of the Gila river. That for the purpose of reducing and treating the said ores so mined, as aforesaid, said defendant has established upon the banks of said San Francisco river and said Chase cheek, and upon the sides of the canyons debouching into said last-named streams, concentrators of a capacity sufficient to, and which now actually, reduce and treat more than three thousand tons of copper ore each day. That it has invested a large amount of money in the development of said mining industry, and in the installation and equipment of concentrators, smelting and reduction works used in the reduction of the products of said mines, and that the plants of this defendant company now used in said operations represent an investment of about $15,000,000. That defendant, in its mining, smelting, and reduction of ores gives employment to about three thousand men, and that a community of about twelve thousand people are dependent for a livelihood upon the operations of the mining works of this defendant and of the other mining companies hereinbefore referred to. That in the reduction of said copper ores by this defendant said ores are crushed and mixed with water, and that a portion of the slickens, slimes, and tailings therefrom finds its way through the creeks, affluents, and canals upon which the works of said defendant are situated, into the waters of the Gila river, and becomes mingled therewith, and is carried by

the waters of said Gila river down to the Upper Gila Valley, in which the farming operations of the plaintiff are carried on, and by and through said river and irrigating ditches, in the ordinary and necessary course of irrigation, to and upon the cultivated lands of plaintiff, and of others like situated.

"That the Gila river is normally subject to periods of flood and of lower water recurrent several times during each year, due to recurrence of torrential rains, alternating with periods without rain or with slow-falling rains. That during such periods of flood said river carries quantities of sedimentary matter, the product of erosion of the mountains, hills, and valleys through which it and its tributaries flow. That this sedimentary matter contains organic fertilizers. That such matter is, at such periods of flood, carried through said irrigating canals in the normal and necessary course of irrigation, to and upon the lands of plaintiff, and upon the cultivated lands of the valley, hereinbefore mentioned, and enhances their fertility, thereby in that respect benefiting said lands. That at such periods of flood the proportion of slickens, slimes, and tailings carried by the waters to the whole amount of sedimentary matter so carried is so small as to be negligible in determining the effects of the sedimentary matter upon the cultivated lands. That at the periods of lower water, the water of said river flowed clear and free from sediments prior to the time when such water began to carry slickens, slimes, and tailings, as herein described, and would continue so to flow, clear and free from sediments, but for such slickens, slimes, and tailings, and then did and now, but for such slimes, slickens and tailings, would continue to, furnish clear water, free from sediments, to the various canals, herein mentioned, for the irrigation of the lands of plaintiff, and of the other lands herein mentioned. That such clear water, free from sediments, is more valuable for the purposes of irrigation than water carrying sedimentary matter, whether of the natural products of erosion or of slimes, slickens, or tailings. That in about the year 1885 the first concentrator was erected for the reduction of ores in connection with the mining enterprises herein mentioned. That at a time which the court cannot exactly determine, but some six to eight years before the institution of this action, the waters of the Gila river at other than flood periods, theretofore clear, became discolored

by slime, slickens, and tailings and began to deposit such slimes, slickens, and tailings through the irrigating ditches, herein mentioned, in the normal and necessary course of irrigation, upon the lands of plaintiff, and other lands herein mentioned.

"That since the last-mentioned time the quantity of such slimes, slickens, and tailings carried by the said river, and so deposited upon said lands of plaintiff, and said other lands continuously increased until after the institution of this suit; that the said slimes, slickens, and tailings so carried upon the said lands of plaintiff, and the other said lands, consist of finely pulverized rock; are inert; are chemically not injurious to the soil, or to plant life; add nothing of value to the farming lands of said valley for any purpose; are destitute of organic fertilizing material, but contain a small quantity of inorganic fertilizing material of a kind with which the soil of the said lands of plaintiff, and other said lands, are, and at the times mentioned herein have been, adequately supplied. That all of said sedimentary matter carried upon said cultivated lands of plaintiff, and other said lands, whether the products of erosion, or slimes, slickens, and tailings, injuriously affects the said cultivated lands for the purpose of raising crops in that it becomes deposited, in constantly increasing depth, on the surface of said cultivated lands, being deposited more heavily, and to a greater depth, near the points at which the water is immediately applied to said lands for the purpose of irrigation, and becoming progressively thinner as the water passes over the said lands farther from the points of immediate diversion and application. That said deposit of sedimentary matter is injurious to said lands for the purpose of raising crops in several respects: One in that it elevates the land adjoining the point of immediate application of the said water, thus compelling the taking of the water supply from increasingly high-water levels in order to flood the water upon said lands; a second in that it forms a compact layer over the soil, not readily permeable by water, thus depriving the roots of the plants of the appropriation and necessary irrigation; and a third in that it packs about the roots and stems of growing plants, thus mechanically choking and burying them to the restriction of their growth and productiveness. That the second named injurious effect is remediable by deep plowing

and harrowing, whereby sedimentary matter so deposited is
mingled with the natural soil.  That the most important crop
grown by plaintiff and by the cultivators of the other culti-
vated lands herein referred to, both in the extent of land on
which said crop is cultivated, and in the value, is alfalfa,
which is a perennial, and cannot be plowed without its de-
struction.  That alfalfa reaches its highest productivity at
the age of three or four years, and continues at a maximum
of productivity, for a lifetime of unascertained duration, in
excess of fifteen years.  That alfalfa stools at or near the sur-
face of the soil, and that the productivity and thriftiness of
the plant is seriously impaired, when the crown at which it so
stools becomes covered.  That said sedimentary deposits are
peculiarly injurious to alfalfa by reason of the fact that they
bury the stooling crowns.  That the injurious effect of such
deposits upon alfalfa may be ameliorated, but not obviated,
by deep harrowing.  That the sedimentary deposit upon culti-
vated soil of slimes, slickens, and tailings is more injurious
than the natural sediment of erosion (to an extent which the
court cannot define in a percentage), by reason of the fact
that the said slimes, slickens, and tailings are much more finely
pulverized than the natural sediment of erosion, and form a
more compact blanket, more nearly impermeable to the pas-
sage of water, and when dry, much harder, more cement-like,
and more difficult to plow, or harrow.  That the said slimes,
slickens, and tailings are also more injurious to growing
plants, in their mechanical choking effect, than the natural
sediment of erosion, by reason, also, of the more fine pulver-
ization of the former, and the more compact way in which
they become packed on and about the roots and stems of such
growing plants.  That normally the periods of lower water in
the said river come at the times when there is the greatest
need of irrigation by growing crops.  That, for a period of a
year or two prior to the institution of this suit, the waters of
the said river carried such a great volume of slimes, slickens,
and tailings that layers of such slimes, slickens, and tailings,
unmixed with other substances, were deposited, in some of
the irrigating ditches more directly affected thereby, and on
the soil near the points of immediate application of water
therefrom for purposes of irrigation, of a thickness of half an
inch or more.  That the plaintiff was injured in the loss of

the productivity of his fields of alfalfa upon his said lands in the year preceding the filing of this suit, by reason of the sedimentary deposits upon his fields of alfalfa, in an amount which the court cannot exactly determine, in excess of $1,000. That from the same cause the crops of alfalfa grown upon the other cultivated lands herein referred to during the said year were diminished to an amount and in a value which the court cannot exactly determine, of many thousands of dollars.

"The court further finds that complaints of the effect of said slimes, slickens, and tailings were first made by the plaintiff to the said defendant about five years ago, and that thereafter said defendant commenced and thereafter prosecuted the work of arresting the same from entering said Gila river, and that in doing so it has established large and expensive settling works, and devised means of carrying off a large proportion of its waste products, and in its said efforts has expended approximately $50,000. That at the time of the trial of this cause about seventy-five per cent of the total waste products of defendant's works theretofore deposited in tributaries of said Gila river were and now are arrested, settled, and otherwise disposed of with such result that a large percentage which the court cannot determine from the evidence, but fixes as in excess of fifty per cent of the slimes, slickens, and tailings theretofore flowing from said works into said river do not so flow. That prior to the institution of this suit the codefendants of this defendant contributed from their reduction works a portion of the slimes, slickens and tailings then being carried by said river to and upon the lands of plaintiff and the other lands herein mentioned. That at the time of the trial of this cause said codefendants had ceased, and agreed to cease, the flowing of such slimes, slickens, and tailings into said river. The court further finds that during the last five years the agricultural lands of the Upper Gila Valley, in the vicinity of Solomonville, including the lands of the plaintiff, have greatly increased in market value and selling price, and that that portion of said lands which are set to alfalfa, and are known as alfalfa lands, have in the last five years increased in value and market price to the same extent as that portion of said lands adapted to and used in the production of cultivated crops. That the injuries complained of in said complaint are continuous, and constantly

increasing.  That plaintiff has no adequate remedy at law for the redress of said injuries caused him by said defendant, in this: That the damages caused to plaintiff by the acts of defendant are of a nature not readily susceptible of proof, in an action at law for damages, and that said injuries in their ultimate effect are irreparable.  That the defendant threatens to, and will, unless restrained by the order of this court, continue to deposit slimes, slickens, and tailings, as hereinbefore set forth, to the damages of plaintiff."

It appears that the defendant company operates three concentrating plants, one of which is located at the town of Morenci, one between Morenci and Clifton, and one at Clifton. At the time of the trial provision had been made whereby all of the slimes, slickens, and tailings from the concentrators other than the one at Clifton were impounded, and none allowed to go into the waters of the Gila river.  It also appears that, owing to the topography of the country, it is impossible to impound and restrain from going into the river the finer and lighter tailings or slimes from the concentrator at Clifton, and that compliance with the order of the court must result in closing down the concentrator at that point.  The evidence does not disclose the capacity of that concentrator, nor the number of persons employed there.  If further appears from uncontradicted testimony in the case that it is practicable to construct and maintain, at moderate expense, settling basins at or near the heads of the various irrigating canals, by means of which much of the sediment, including that from the defendant's concentrator, may be prevented from going into the irrigating canals.

Walter Bennett, and M. J. Egan, for Appellant.

A private person may only maintain an action to enjoin a public nuisance under certain circumstances.  These are when by such public nuisance he sustains a direct injury different not only in degree but in kind from that suffered by the public as to whom the nuisance exists.  A private individual cannot maintain an action to enjoin a public nuisance except as above stated.  *George* v. *Peckham,* 73 Neb. 794, 103 N. W. 664; *Anthony* v. *McIlquam,* 14 Wyo. 209, 83 Pac. 364, 3 L. R. A., N. S., 733; *Jarvis* v. *Santa Clara, etc.,* 52 Cal. 438; *Bigley* v. *Nunan et al.,* 53 Cal. 403; *McCloskey* v. *Kreling,* 76 Cal.

512, 18 Pac. 433; *Crowley* v. *Davis,* 6ᵇ Cal. 460; *Siskiyou etc.*
v. *Rostel,* 121 Cal. 511, 53 Pac. 1118; *City Store* v. *San Jose,*
*etc.,* 150 Cal. 277, 88 Pac. 977; *Donohue* v. *Stockton, etc.,* 6
Cal. App. 276, 92 Pac. 196; *Kuehn* v. *Milwaukee et al.,* 83 Wis.
583, 53 N. W. 912, 18 L. R. A. 553; *Whitmore* v. *Brown,* 102
Me. 47, 120 Am. St. Rep. 454, 65 Atl. 516, 9 L. R. A., N. S.,
868; *Jones* v. *City of Chanute,* 63 Kan. 243, 65 Pac. 243;
High on Injunctions, secs. 762, 1301.

Relief by injunction is exercised by the courts with great
caution. The injunctive relief will only be granted when
it is clear from the evidence that the injuries sustained result
only and directly from the works complained of; that the
damages sustained are substantial and comparable to· the
damages which would flow from the operation of the injunc-
tion, and that the plaintiff cannot be compensated by a money
judgment for damages. *Wees* v. *Coal & Iron Co.,* 54 W. Va.
421, 46 S. E. 166; *Mountain Copper Co.* v. *United States,* 142
Fed. 625, 73 C. C. A. 621; *McCarthy* v. *Bunker Hill etc.,* 147
Fed. 981; *Madison* v. *Ducktown,* 113 Tenn. 331, 83 S. W. 658.

Armstrong & Lewis, for Appellee.

When a private person has sustained special injuries from a
public nuisance, he thereby gains a standing in court which
enables him to maintain a suit for injury. In the suit so
brought the plaintiff acts on behalf of all others who are or
may be injured, as a public prosecutor rather than on his own
account. The court, in deciding such suit, has regard to the
interests of the public, as well as to those of the plaintiff.''
*Woodruff* v. *North Bloomfield Gravel Min. Co.,* 18 Fed. 753,
9 Saw. 441.

CAMPBELL, J.—It is insisted by the appellant that, if any
wrong is being done by permitting débris from its mining
operations to go into the river, the acts constitute a public
nuisance, and that the plaintiff may not maintain this action,
because it does not appear that the injury sustained by him
differs in kind from that sustained by the general public.
The supreme court of the United States, our appellate court,
in the early case of *Georgetown* v. *Alexandria Canal Co.,* 12
Pet. 91, 9 L. Ed. 1012, after reviewing the authorities, say:
''The principle then is that, in case of a public nuisance, where

a bill is filed by a private person, asking for relief by way of prevention, the plaintiff cannot maintain a stand in a court of equity, unless he avers and proves some special injury." In *Mississippi etc. R. R. Co.* v. *Ward*, 2 Black, 485, 17 L. Ed. 311, it is said: "A bill in equity to abate a public nuisance, filed by one who has sustained special damages, has succeeded to the former mode in England of an information in chancery, prosecuted on behalf of the crown, to abate or enjoin the nuisance as a preventive remedy. The private party sues rather as a public prosecutor than on his own account; and unless he shows that he has sustained, and is still sustaining, individual damage, he cannot be heard. He seeks redress of a continuing trespass and wrong against himself, and acts in behalf of all others, who are or may be injured."

The rule, as stated by many, if not most, of the courts of the states, is that to authorize a private citizen to maintain an action to abate a public nuisance he must show a special injury, different in kind, and not merely in degree, from that suffered by the public generally, and much difficulty has been found in determining when the injury differs in kind rather than in degree from that suffered by the public. This difficulty has led the supreme court of Minnesota to declare that: "No general rule can be laid down which can be readily applied in every case. Where to draw the line between cases where the injury is more general or more equally distributed and cases where it is not, where by reason of local situation the damage is comparatively much greater to the special few, is often a difficult task. In spite of all the refinements and distinctions which have been made, it is often a mere matter of degree, and the courts have to draw the line between the more immediate obstruction or peculiar interference, which is a ground for special damage, and the more remote obstruction or interference which is not." *Kaje* v. *Railway Co.*, 57 Minn. 422, 47 Am. St. Rep. 627, 59 N. W. 493. One of the clearest statements, we think, of the distinction is to be found in *Wesson* v. *Washburn Iron Co.*, 13 Allen (Mass.), 95, 90 Am. Dec. 181, where it is said: "The real distinction would seem to be this: That when the wrongful act is of itself a disturbance or obstruction only to the exercise of the common and public right, the sole remedy is by public prosecution, unless special damage is caused to individuals. In such case the act of itself

does no wrong to individuals distinct from that done to the whole community. But when the alleged nuisance would constitute a private wrong by injuring property or health, or creating personal inconvenience or annoyance, for which an action might be maintained in favor of a person injured, it is none the less actionable because the wrong is committed in a manner and under circumstances which would render the guilty party liable to indictment for a common nuisance. This we think is substantially the conclusion to be derived from a careful examination of the adjudged cases. The apparent conflict between them can be reconciled on the ground that an injury to private property, or to the health and comfort of an individual, is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however numerous may be the cases of similar damage arising from the same cause.''

Tested by these rules, we have no difficulty in concluding that the plaintiff may maintain this action. By reason of the acts of the defendant he, with other owners of land irrigated by water from the Gila river, is suffering a direct individual injury, different from that of the general public. It is true that the general public also suffers an injury from the acts of the defendant, but only in the sense that whatever decreases the general prosperity of the community injures all who are members of the community. The injury of those so suffering is general, and not special.

Appellant contends that the facts found by the court do not disclose that it is committing any wrong, for the reason that it is engaged in the conduct of a lawful business; that the right to use the waters of a public stream for mining purposes is recognized by law; that its rights in that respect are equal to those of the agriculturist to use the water for purposes of irrigation; and that in depositing in the river only such of the slimes and tailings as is reasonably necessary in the successful operation of its business it is acting wholly within its rights. Riparian rights do not exist in this territory. The laws of the territory do recognize the right to appropriate the waters of public streams for mining purposes, as well as for agriculture. No superior right, however, is accorded the miner. Under the doctrine of appropriation, he who is first in time is first in right, and so long as he contin-

ues to apply the water to a beneficial use, subsequent appropriators may not deprive him of the rights his appropriation gives, either by diminishing the quantity or deteriorating the quality.   We do not mean to say that the agriculturist may captiously complain of the reasonable use of water by the miner higher up the stream, although it pollutes and makes the water slightly less desirable, nor that a court of equity should interfere with mining industries because they cause slight inconveniences or occasional annoyances, or even some degree of interference, so long as such do no substantial damage; but to permit a subsequent appropriator to so pollute or burden the stream with débris as substantially to render it less available to the prior appropriator causes him to lose the rights he gained by appropriation as readily as would the diversion of a portion of the water which he appropriated. The plaintiff, by his grantors, appropriated water for the purposes of irrigation in 1872, as did other agriculturists in the community, and, while it does not clearly appear when the defendant first made use of water in connection with its operations, it does appear that it was not prior to 1885.

Counsel press upon us the proposition that we should consider the comparative damage that will be done by granting or withholding an injunction in this case, alleging that the effect of an injunction will be to stop the operation of extensive works, deprive thousands of persons of employment, and cause loss and distress to other thousands.   It is undoubtedly true that a court should exercise great care and caution in acting where such results are to follow.   It should very clearly appear that the acts of the defendant are wrongful, and that the complainant is suffering substantial and irreparable injury, for which he cannot secure adequate compensation at law.   A number of eminent courts support the contention of appellant that the comparative injury to the parties in granting or withholding relief must also be considered.   Among the cases so holding is *McCarthy* v. *Bunker Hill and Sullivan Mining etc. Co.,* 164 Fed. 927, decided by the circuit court of appeals for this circuit, a court for which we entertain the highest respect, and which exercises an appellate jurisdiction over this court in certain cases; and, if this case were reviewable there, we should not feel at liberty to express views in conflict with those of that

court. But this case is reviewable only by the supreme court of the United States, and we cannot find, as suggested by the circuit court of appeals, that that court has given adherence to the doctrine. It seems to us that to withhold relief where irreparable injury is, and will continue to be, suffered by persons whose financial interests are small in comparison to those who wrong them is inconsistent with the spirit of our jurisprudence. It is in effect saying to the wrongdoer, "If your financial interests are large enough so that to stop you will cause you great loss, you are at liberty to invade the rights of your smaller and less fortunate neighbors." We prefer the doctrine adhered to by Judge Hawley in his dissenting opinion in *Mountain Copper Co.* v. *United States,* 142 Fed. 625, 73 C. C. A. 621, and by Judge Sawyer in *Woodruff* v. *Northbloomfield Gravel Min. Co.* (C. C.), 18 Fed. 753, 9 Saw. 441. In the latter case, it is said: "Of course great interests should not be overthrown on trifling or frivolous grounds, as where the maxim *'De minimis non curat lex'* is applicable; but every substantial, material right of person or property is entitled to protection against all the world. It is by protecting the most humble in his small estate against the encroachments of large capital and large interests that the poor man is ultimately enabled to become a capitalist himself. If the smaller interest must yield to the larger, all small property rights, and all smaller and less important enterprises, industries, and pursuits would sooner or later be absorbed by the large, more powerful few; and their development to a condition of great value and importance, both to the individual and the public, would be arrested in its incipiency." To the same effect are the remarks of Judge Marshall in *McCleery* v. *Highland Boy Gold Min. Co.* (C. C.), 140 Fed. 951, wherein he says: "The substantial contention of the defendant is that it is engaged in a business of such extent, and involving such a large capital, that the value of the plaintiff's rights sought to be protected is relatively small, and that therefore an injunction, destroying the defendant's business, would inflict a much greater injury on it than it would confer benefit upon the plaintiffs. Under such circumstances it is asserted, courts of equity refuse to protect legal rights by injunction and remit the injured party to the partial relief to be obtained in actions at law. Stated in another way, the claim in effect is that one

wrongfully invading the legal rights of his neighbor will be permitted by a court of equity to continue the wrong indefinitely on condition that he invest sufficient capital in the undertaking. I am unable to accede to this statement of the law. If correct, the property of the poor is held by uncertain tenure, and the constitutional provisions forbidding the taking of property for private use would be of no avail. As a substitute it would be declared that private property is held on the condition that it may be taken by any person who can make a more profitable use of it, provided that such person shall be answerable in damage to the former owner for his injury. In a state of society the rights of the individual must to some extent be sacrificed to the rights of the social body; but this does not warrant the forcible taking of property from a man of small means to give it to the wealthy man, on the ground that the public will be indirectly advantaged by the greater activity of the capitalist. Public policy, I think, is more concerned in the protection of individual rights than in the profits to inure to individuals by the invasion of those rights." See, also, *Sullivan* v. *Jones & Laughlin Steel Co.*, 208 Pa. 540, 57 Atl. 1065, 66 L. R. A. 712.

However if we felt called upon to undertake the task of comparing the injury that must result to the two communities, we are not certain that the comparison would result favorably to the appellant. While the testimony shows, and the trial court found, that the appellant has invested about $15,000,000 and gives employment to about three thousand men, and that many others are dependent upon the operation of its properties, the testimony also discloses that but one of its three concentrators will be affected by the injunction; that the slimes and tailings from the others are impounded and do not find their way into the river, and it is not shown just what hardship will result to the corporation or community from the closing of this concentrator. Upon the other hand, the one principal industry of the Upper Gila Valley, alfalfa raising, will suffer great injury and possible destruction if the injunction be refused. The destruction of that industry, or even serious injury to it, will in a measure bring disaster to a large and prosperous community. In our opinion, a court should exercise great care but should not refuse relief where the injury is substantial and the right clear.

One of the witnesses who testified on behalf of the defendant was Professor R. H. Forbes, director and chemist of the Agricultural Experiment Station at the University of Arizona. Both plaintiff and defendant put in evidence a bulletin prepared by Professor Forbes, and issued by the University of Arizona, in which are set forth the observations and conclusions of the writer as to the effects of the sediments of the Gila river and of the mining detritus, such as comes from appellant's concentrators, upon the agricultural lands of the Upper Gila Valley. Appellant now complains that some of the conclusions reached by Professor Forbes are not warranted by the facts which he observed and recorded. We have given the matter attention, but to review the testimony here would unduly extend this opinion. It seems sufficient to say that in our opinion the testimony of Professor Forbes, together with that of the farmers, fully sustains the findings of fact made by the trial court.

It would seem from the testimony of Professor Forbes that it is practicable, at comparatively small expense, to construct settling basins at or near the heads of the canals, or elsewhere along the river, by means of which the tailings and slimes carried by the Gila river from appellant's concentrator may be arrested and prevented from being deposited upon the farming lands. We do not agree with appellant that the farmers should be required to construct and maintain such basin, but we see no reason why, if such basins will afford relief, appellant should not be permitted to construct and maintain them at its own expense. This suggestion does not appear to have been presented to the trial court, and its decree is so drawn that such means of relief may not be availed of, since appellant is enjoined from permitting any of the tailings or slimes to reach the waters of the Gila river. We think, to enable the mining company to take advantage of any efforts it may make in this direction, it should be left to the discretion of the trial court hereafter, upon a proper showing made to it, temporarily to modify the injunction so as to permit of reasonable experiments being made to ascertain the probability of successfully erecting and maintaining settling basins to effectually dispose of the tailings and slimes without detriment to the lands lying under the canals, and with authority in the district court like-

wise permanently to enforce or modify the injunction in accordance with the conditions as they shall be found to be.

The decree of the district court is modified as indicated, and, as modified, is affirmed.

KENT, C. J., and SLOAN and DOAN, JJ., concur.

NOTE.—As to pollution of stream by mining operations, see notes to *Drake* v. *Lady Ensley Coal I. & R. Co.* (Ala.), 24 L. R. A. 64, and *Straight* v. *Hover* (Ohio), 22 L. R. A., N. S., 276.

As to right of prior appropriator of water, see note to *Isaacs* v. *Barber* (Wash.), 30 L. R. A. 665.