406 P.2d 441

Charles BRASHER and Bessie Brasher, husband and wife, Byrt M. Waller and Lucille M. Waller, husband and wife, Appellants,

v.

Keaton GIBSON, Appellee.*

1 CA–CIV 76.

Court of Appeals of Arizona.

Oct. 18, 1965.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's number 8058. The matter was referred to this Court pursuant to Section 12–120.23 A.R.S.

Westover, Copple, Keddie & Choules, by William H. Westover, Yuma, for appellants.

Brandt & Baker, by Thadd G. Baker, Yuma, for appellee.

DONOFRIO, Judge.

This is an appeal from a judgment rendered in favor of the defendant in a trial to the court. The appellants, plaintiffs in the court below brought action against defendant, appellee herein, claiming that defendant was wrongfully obstructing and dividing what is known as "Cibola Slough" or "Cibola Lake", hereinafter referred to as Cibola Slough, and was wrongfully controlling the natural flow of water into Cibola Slough to the injury of plaintiffs' property which is riparian to Cibola Slough. Plaintiffs' claims were denied by defendant.

The main issue to be resolved is whether or not the waters of Cibola Slough are private or public. A brief statement of the facts is necessary in determining this issue.

Cibola Slough is located contiguous to the Colorado River in Yuma County, Arizona. It is approximately three miles long and one-half mile wide. Its water is supplied from the Colorado River. The Slough is used primarily for hunting and fishing. The Plaintiffs and defendant both own property riparian to Cibola Slough on which they have established lodges to accommodate the public in its use of Cibola Slough. The plaintiffs' property is located to the north of defendant's property. The United States Government owns the land riparian to the last 400 or 500 feet of the slough from the south end of the defendant's property and also land at the inlet.

It is not clear how long Cibola Slough has been in existence. Prior to the construction of Boulder Dam in 1935, the land in question was used for farming and was irrigated from overflow water during flood seasons and there had been intermittently a slough or dry, depending on the condition of the Colorado River. In 1935 water was first impounded behind Boulder Dam causing the Cibola Slough area to dry up completely. The area remained dry until the completion of Imperial Dam in

1938 when, due to the impounding of the water behind the dam which was to the south of and downstream from the land in question, the river backed up into the area known as Cibola Slough. How long the area remained completely inundated is not shown from the record but apparently after both dams were filled the level of the slough would vary directly with the level of the river. Since 1938, the original slough, prior to any turnout structures or dikes being placed on the land by defendant, contained an inlet from, and an outlet to, the Colorado River and sufficient water to be designated as a slough on maps of the area and to be used for recreation by the general public.

Cibola Slough is fed from the waters of the Colorado River, by a wash or channel. The record is replete with testimony to the fact that it is a natural channel and that it has been in existence for many years. The water enters this channel at the north from the Colorado River and flows for about one-half mile in an Easterly direction and then it turns and flows South for about two-thirds mile where the water begins to spread out and form the slough which extends on down for about three miles to where it empties back into the Colorado River over a spillway.

The Colorado River fluctuates during each 24 hour period. It starts rising about 4:00 P.M. and stays high until about 7:00 A.M. After 7:00 A.M. it begins receding. More water will flow in during the rising river than during the receding river. This appears to be the River cycle each 24 hour period.

The River also fluctuates over different periods of the year. There is generally sufficient water in the river to cause a continuous flow in the channel from February to October of each year. The reason for it being higher during this period is due to the water needed for irrigation that is released from the dams above. From October to February there is only a flow when the River is high.

The natural channel when it is flowing water is sufficiently large enough to be navigable by small boats to the Colorado River from Cibola Slough, and from the River into the Cibola Slough area. This was no longer possible after 1958 when the defendant constructed an inlet turnout structure on the channel. This was dynamited out by an unknown agency and defendant then constructed the bridge turnout structure on the channel about 200 feet from the inlet. These two structures effectively prevented small boats from navigating from the slough to the River or from the River to the slough.

The first work done by defendant in connection with improving Cibola Slough was the construction of a dike at the south end of the slough in 1955. In early 1957 this was washed out completely by flood. The dike was rebuilt in the fall of 1957 but was considerably larger and higher than the original dike. The purpose of this dike is to impound more water. There is still an outlet at the lower end but the slough must reach a certain level before it will spill over and flow out.

The next work done by defendant was to widen and clean out a part of the inlet channel from the River down a short distance past the bridge turnout structure. This work was done at the same time the bridge turnout structure was put in. The only other work done on the inlet channel by defendant was in the latter part of February or 1st of March, 1964, when the defendant bulldozed a new channel for about 400 feet or 500 feet. This new channel starts some distance below the bridge turnout structure and by-passes a beaver pond and connects up again with the original channel. The purpose of this rechanneling was to allow the water to flow into the slough faster. The water was prevented from entering the channel for about 48 hours, while this work was being done. The water was about two feet deep in the channel, and was running so that it would have reached the slough had it not been blocked off. Earlier in May of 1960 there is testimony that defendant by closing the bridge control gate had prevent-

ed water from entering the slough. There were other occasions where it was reported that the bridge control gate was closed but it does not appear whether there was any water in the channel. There was no showing defendant substantially affected the water level in the slough by these obstructions.

The defendant prior to the rechanneling had started in December of 1961, to construct a dike along the northern boundary of his property to extend clear across the slough so as to divide the slough in half. Work was continued on this dike until February of 1962. The dike extends at this time about one third of the way across the slough.

Except for the boundary dike which is located on the defendant's land, all other structures and dikes constructed by defendant are located on United States Government land and that the only interest the defendant claims in these lands is one of possession.

Cibola Slough between the months of October through February in the past years has lost water through evaporation and seepage to cause the meander line at the north end to fluctuate as much as 1000 feet. This appears to be a recurring thing that happens each year though in some years it may dry up more than in others. The slough in February of 1962 was almost dry but by April 1 it was starting to fill. There is no showing that defendant's actions contributed in any measurable amount to the slough drying up.

The defendant on different occasions has prevented plaintiffs and plaintiffs' customers from using the lower part of the slough and has erected "No Trespassing" signs on his north boundary.

The findings of the trial court were to the effect that the plaintiffs have sustained no legal damage by reason of the construction and use by the defendant of the turnout structures located upon the lands claimed by possessory right by the defendant nor have they sustained any legal damage by reason of the construction by defendant of a levy upon the northerly prop-

erty line of the patented land owned by defendant; further that as between plaintiffs and defendant, defendant had a legal right to construct turnout structures and levies, and to fill and maintain the area known as Cibola Lake (Slough). In addition the court found that while the waters constituting what is referred to as Cibola Lake come from the Colorado River they are not public waters but constitute private waters as an artificial lake constructed by the defendant and that the defendant has appropriated the waters to a beneficial use.

■ The record does not show us the court's reasoning for its findings, however, we can surmize that it determined that the water forming the slough or lake was not any part of a stream but was a body of water such as is formed by the overflow of flood waters or diffused surface waters. A body of water can also be a slough which is a side-channel of a river with an entrance and an outlet. We believe the facts are uncontradicted that the waters herein involved are of this latter type.

Cibola Slough has its connection with the Colorado River in that it has its source and terminance in the Colorado River. The water enters the inlet channel and travels about 3 miles down through the slough and back into the river. The slough system is merely an arm and is part of the Colorado River. In Turner v. James Canal Co., 155 Cal. 82, 99 P. 520, 22 L.R.A.,N.S., 401 (1909), the California Supreme Court considered a slough that had as its source of water two rivers:

"The court finds, however, that Fresno slough is always connected with the San Joaquin river so that water will flow from the river into the slough, or from the slough into the river, as one may be higher than the other at the particular time. Under the circumstances, we think that a person owning land abutting upon the slough has an equal right to take water therefrom, and an equal right to a reasonable share of the water, with another person who owns land abutting

upon the main stream. * * * While the water is running into the slough from Kings river, the slough is a part of that river. * * * When Kings river does not run into the slough, the latter becomes a part of the San Joaquin river, with which it is then connected, and during that period the lands riparian to the slough are entitled to a share of the water of the whole San Joaquin river, including the slough. This latter right is the result of the fact that, while that condition prevails, the slough is really a part of the river, and the taking of water from the slough will affect the flow of the river, either by preventing by that much an addition to the main stream when that stream is so low that the water will flow into it from the slough, or by drawing water into the slough from the river when the slough is lowered by the diversion." 99 P. 523, 524.

To the same effect is Miller & Lux v. Madera Canal & Irrigation Co., 155 Cal. 59, 99 P. 502, 22 L.R.A.,N.S., 391 (1909); Weil, Water Rights in the Western States, 3rd Ed. § 338, p. 359; Kinney on Irrigation and Water Rights, 2nd Ed. § 315, p. 513. Also in Bachman v. Reynolds Irr. Dist., 56 Idaho 507, 55 P.2d 1314 (1936), the Idaho Supreme Court said:

"The fact that these waters flowed through sloughs would not necessarily change the character of the watercourse nor make such waters not subject to appropriation." 55 P.2d 1316.

■ It is also apparent that a slough such as exists in the case here can be a water course. Bachman v. Reynolds Irr. Dist. (supra); Turner v. Smith, 217 Ark. 441, 231 S.W.2d 110 (1950); Miller v. Eastern Ry. & Lumber Co., 84 Wash. 31, 146 P. 171 (1915); Hutchinson v. Watson Slough Ditch Co., 16 Idaho 484, 101 P. 1059 (1909). Those cases dealing with surface water drainage forming a slough are not this case, Withers v. Berea College, Ky., 349 S.W.2d 357 (1961), nor is this the case where a body of water is formed by the overflow of flood waters. Here the source of water is the Colorado River. When the water is taken from the slough the river will be proportionately reduced. Likewise any reduction in the river will affect the amount of water in the slough. Through the ages rivers have run as they are wont to flow, changing courses, spreading out over the land, dividing and then coming back together leaving arms remaining, eventually ending up at sea. This is what has taken place in the case here. The slough system was at one time probably the main channel of the Colorado River but sedimentation has caused it to shift its course leaving as evidence of its passing the slough system. A. R. Lobeck, Geomorphology (1939); McGraw-Hill Book Company, Inc.

■■ The mere fact that the defendant placed a dike at the outlet end of the slough upon United States Government land, claiming only a possessory interest therein, does not change the nature of the slough into an artificial body of water capable of private ownership. Nor does the fact that defendant cleaned and straightened out part of the channel leading into the slough make it any less a natural water course. Boone v. Wilson, 125 Ark. 364, 188 S.W. 1160 (1916); Smith v. City of Los Angeles, 66 Cal.App.2d 562, 153 P.2d 69 (1944); Harmon v. Gould, 1 Wash.2d 1, 94 P.2d 749 (1939). The slough system existed in a natural state long before the defendant placed any structures in the area.

■ It may be that the trial court considered Cibola Slough a lake separate and distinct from the Colorado River. The waters in question inundate both government and private land and were it considered a lake separate and distinct from the Colorado River, a view we do not ascribe to, the law is clear that it would be public waters. Hutchins, Selected Problems in the Law of Water Rights in the West, U. S. Dept. of Agriculture Misc. Pub. No. 418, p. 9 (1942); A.R.S. § 45–101; State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421 (1945).

Public water is defined in A.R.S. § 45–101, subsec. A as follows:

"The waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or surplus water, and of lakes, ponds and springs on the surface, belong to the public and are subject to appropriation and beneficial use as provided in this chapter." A.R.S. § 45–101, subsec. A.

In order to sustain the plaintiff's contention of public waters Cibola Slough must fall within the language of the Statute. We believe it does in this instance. The Colorado River, which furnishes the slough with water, is one of the great navigable rivers of the west, and a navigable stream is dedicated to the public for its use and enjoyment. United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1912); United States v. Twin City Power Co., 350 U.S. 222, 223, 76 S.Ct. 259, 100 L.Ed. 240 (1955). The state owns title to the waters of navigable streams subject to the servitude of the Commerce Clause in The United States Constitution. Martin v. Waddell's Lessee, 16 Pet. (U.S.) 367, 10 L.Ed. 997 (1842).

In view of the fact neither party has effected an appropriation under the State Water Code, particularly A.R.S. § 45–101, subsec. A and § 45–142 we feel the facts of this case warrant our covering the respective rights of the parties to the waters involved especially with reference to riparian rights.

In Hutchinson v. Watson Slough Ditch Co., (supra) the Idaho court stated:

"The question then arises under this state of facts as to whether or not the riparian proprietor has any such rights as he can assert against an entire stranger to and intermeddler with the waters of the stream for the period of time covered and involved in this action. The query arises: Is there anything in the Constitution of this state contrary or repugnant to the assertion by respondent of his riparian rights as against one who attempts to shut off the source of supply of the stream, and who does not found his right to do so upon his appropriation of such waters to a beneficial use? * * *

As we have before seen, the common-law doctrine of riparian proprietorship, whenever it comes in conflict with a water right acquired by appropriation, is at once in conflict with and repugnant to both the Constitution and Statutes of this state. We are unable to find, however, any particular wherein it would be repugnant to any provision either of the organic or statutory law of the state where it does not come in conflict with a right acquired by appropriation in conformity with law. * * *

* * * In other words, there is no such thing, in this state as a riparian right to the use of waters as against an appropriator and user of such waters who has pursued the constitutional and statutory method in acquiring his water right. * * * But a riparian owner still retains such right to have the waters flow in the natural stream through or by his premises as he may protect in the courts as against persons interfering with the natural flow, or who attempt to divert or cut off the same wrongfully and arbitrarily, and without doing so under any right of location, appropriation, diversion, or use, and who do not vest their right to do so upon any right of use or appropriation. In other words, a stranger to the use and right of use of such waters for the time being cannot interfere, and, if he does, the riparian owner has his remedy to restrain and enjoin such interference." 101 P. 1062, 1063.

Though the Idaho case dealt with a riparian owner restraining one not a riparian we think the principle would apply in Arizona in the case here, involving two riparians neither of which have made a valid appropriation. We do not by this

language quoted mean to imply that a private individual, being a riparian owner may acquire any right to make a beneficial use of water merely because he is a riparian owner. This must be done by complying with the statutory procedure. Article 17, Constitution of the State of Arizona, § 1, A.R.S., provides:

"The common law doctrine of riparian water rights shall not obtain or be of any force or effect in the State."

See also Boquillas Land and Cattle Company v. Curtis, 213 U.S. 339, 29 S.Ct. 493, 53 L.Ed. 822 (1909); Clough v. Wing, 2 Ariz. 371, 17 P. 453 (1888); Arizona Copper Co. v. Gillespie, 12 Ariz. 190, 100 P. 465 (1909).

■■■■ The problem faced then is whether we will recognize any riparian rights when appropriation rights are not affected thereby notwithstanding Art. 17, § 1 of the Arizona Constitution. All the Arizona cases cited above construing the constitutional provision involved the assertion of a riparian right against an appropriator. Those cases correctly state that in such a situation riparian rights do not exist. But in a case where no appropriation rights are affected then it is not inconsistent to apply a rule of riparian right. In Hill v. Lenormand, 2 Ariz. 354, 16 P. 266 (1888) the court stated:

"Riparian rights are the same here as elsewhere, wherever they apply; but they do not apply where the rights of prior appropriators have intervened." 2 Ariz. 357, 16 P. 268.

At the time of this decision there existed a territorial statute adopted on Mar. 10, 1887, to the same effect as our present constitutional provision in Art. 17, § 1. The court apparently interpreted the statute as abrogating riparian rights wherever they came in conflict with rights acquired by appropriations. This we believe to be a sound interpretation and one that will do substantial justice. And that the United States still has riparian rights in at least its reserved lands see, State of Nevada ex rel. Shamberger v. United States, D. C., 165 F.Supp. 600; 9 Cir., 279 F.2d 699 (1960); F.P.C. v. State of Oregon, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); Gutierres v. Albuquerque Land & Irrigation Co., 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588 (1902).

■■■■ As is seen by the mandate of our state water code prior appropriation shall give the better right for surface water and subterranean streams. A.R.S. § 45–101 et seq. This rule is also announced in State of Arizona v. State of California, 298 U.S. 558, 56 S.Ct. 848, 80 L.Ed. 1331 (1936); Daggs v. Howard Sheep Co., 16 Ariz. 283, 145 P. 140 (1914). As to percolating waters the doctrine of reasonable use applies and not the doctrine of prior appropriation. Bristor v. Cheatham, 73 Ariz. 228, 240 P.2d 185 (1952), rev. 75 Ariz. 227, 255 P.2d 173 (1953). We might add that society and its knowledge developed these anomalous distinctions between surface and ground waters completely overlooking the hydrological cycle. But the distinctions are too well engrained with stare decisis to change today.

■■■■ The law of prior appropriation grew up out of the law of capture. This doctrine will only work in a frontier society with static conditions. This is clearly shown in Colorado, wherein, by constitutional provisions the right to appropriate water can never be denied. Colorado has a map and statement system to perfect a valid appropriation. With such a system the streams have become so over appropriated that many appropriators have only paper rights. To remedy this situation, Wyoming, in 1890 adopted the permit system, designed by Elwood Mead, for appropriation of surface waters. Arizona adopted the permit system in 1919 as the exclusive method of perfecting a valid appropriation of surface waters and subterranean streams. A.R.S. § 45–101, subsec. A and § 45–142. We no longer have the map and statement method of perfecting an appropriation or the mere

application of water to a beneficial use. Since 1919 a sine qua non to a valid appropriation is complying with the statute. Parker v. McIntyre, 47 Ariz. 484, 56 P.2d 1337 (1936). The right to appropriate water is a contingent right under the permit system of appropriation. There is no absolute right to appropriate water.

"All the states are in transition from various forms of extreme individualism and vested property rights of substance in water to the same goal, the economical distribution of state owned water by a state administrative machinery thru state-granted conditional privileges of user." Moses Lasky, FROM PRIOR APPROPRIATION TO ECONOMIC DISTRIBUTION OF WATER BY THE STATE —VIA IRRIGATION ADMINISTRATION, 1 Rocky Mt.L.Rev. 161 (1929).

█ Fishing and recreation are beneficial uses for which a valid appropriation can be made. A.R.S. § 45–141, subsec. A; State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P:2d 421 (1946).

There is no evidence in the instant case of a valid appropriation perfected in compliance with the Arizona statutory procedure nor with the procedures set forth in State of Arizona v. State of California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964) for obtaining a water right to the main stream waters of the Colorado River.

█ Aside from the fact that the Defendant has not complied with the procedures to perfect a valid appropriation, he is also precluded from claiming a valid appropriation on the grounds that he has not claimed an exclusive use. The claiming of an exclusive use is necessary to a valid appropriation. Lake Shore Duck Club v. Lake View Duck Club, 50 Utah 76, 166 P. 309, L.R.A.1918B, 620 (1917). Defendant is not trying to exclude all the public

but only the plaintiffs and their customers. Defendant testified as follows:

"Q. It is your position, is it not, Mr. Gibson, is that this body of water laying south of your north boundary line is your own private lake and you can do with it as you please?

A. That is my opinion.

Q. You are going to keep everybody off that particular part of the lake even though you don't own the lower part?

MR. BAKER: That is argumentative Your Honor.

Q. You propose to keep everybody off there except those who come to your camp and do business with your camp?

A. No, Sir. There's people that come into the south end of the lake. They come two or three times a year. They can fish within three or four hundred feet. They never both me."

The South 400 or 500 feet of the lake covers United States Government Land. Whether the defendant is contending that he can control all of Cibola Slough below his north boundary to the exclusion of the public in using the slough from the Government Land access or merely from the portion of the slough between his property lines is not clear. There are two reasons that foreclose either assertion by defendant. One is, that, as previously determined the slough being a part of the Colorado River is a navigable body of water not subject to private ownership. The second is on the authority of State ex rel. State Game Commission v. Red River Valley Co. (supra). In that case the land was private encompassing the greater portion of a nonnavigable river on which had been placed a dam. The public had access to the lake without trespassing on the private land. The court held that recreation was a beneficial use and the public had a right to use the whole lake notwithstanding the land which the lake covered was private.

It will be noted that recreation is a beneficial use by Statute in Arizona, A.R.S. § 45–141.

Defendant has stated that he is going to place a gate in the northern boundary dike which if completed will divide the slough, in order to get water into his part of the slough. If it is a private body of water as he contends then on what basis does he claim a right to take water out from the part of the slough that is encompassed by plaintiffs' property, there being no right of appropriation asserted. If we hold, as defendant contends, then there would be nothing to prevent the plaintiffs from completely obstructing the flow of water down to the lower part of the slough thereby drying up what the defendant contends he has an exclusive right to use.

■ As seen from the above, the defendant is without right in attempting to divide the slough by construction of the northern boundary dike or to control the flow of water into the slough. The defendant contends that he has gained some right from the fact that he has expended considerable sums of money in putting in the dikes and turnout structures. Were this the basis of making a valid appropriation then our administrative system of water law has been rendered useless. We are compelled to leave the defendant with his generosity. The right of the public to enjoy the use of the waters of Cibola Slough cannot be foreclosed by the circumstances here.

■ An injunction is the proper remedy in the circumstances shown here. Arizona Copper Co. v. Gillespie, 12 Ariz. 190, 100 P. 465 (1909); 230 U.S. 46, 33 S.Ct. 1004, 57 L.Ed. 1384 (1913); A.R.S. § 12–1801; see also 56 Am.Jur., Waters § 38, p. 524.

■ Absent a mistake of law, where the testimony is in conflict the findings and judgment will be upheld; but if the testimony is uncontradicted, or there is no substantial or reasonable evidence to support the findings and judgment, they will be set aside. LaRue v. Kosich, 66 Ariz. 299, 187 P.2d 642 (1947); City of Phoenix v. Anderson, 65 Ariz. 311, 180 P.2d 219 (1947); State Tax Commission of Arizona v. Magma Copper Co., 41 Ariz. 97, 15 P.2d 961 (1932). The facts in this case were substantially undisputed and therefore the findings of fact numbers 8, 9, 11 except as that language may include the south dike in the word levies, 12 and 14 are not supported by the evidence or the law. Finding of fact number 13 allowing defendant to drain his land is correct so long as he does not interfere with the natural water course.[1]

■ The court is not bound by the conclusions of law of the trial court. Miller v. Boeger, 1 Ariz.App. 554, 405 P.2d 573 (1965); Cantlay & Tanzola, Inc. v. Senner, 92 Ariz. 63, 373 P.2d 370 (1962). Conclusions of law numbers 1, 2, 5, 6 and 7[2] are erroneous.

1. FINDINGS OF FACT: 8. That plaintiffs have sustained no legal damage by reason of the construction and use by the defendant of the turnout structures located on the northerly portion of Section Nineteen (19) upon the lands claimed by possessory right claim by the defendant. 9. That plaintiffs have sustained no legal damage by reason of the construction by defendant of a levy upon the northerly property line of the above said patented land owned by the defendant. * * * 11. That as between plaintiffs and defendant, defendant had a legal right to construct turnout structures and levies, and to fill and maintain

the area known as Cibola Lake. 12. That while the waters constituting what is referred to as Cibola Lake come from the Colorado River they are not public waters but constitute private waters as an artificial lake constructed by the defendant. 13. That the defendant would have the right to drain all water from his land if desired and use it as a farm. 14. That the defendant has appropriated the waters to a beneficial use.

2. CONCLUSIONS OF LAW: 1. That under the facts of this case, defendant had a legal right to construct turnout structures and operate the same, and that the maintenance and operation and con-

 

Conclusions of law numbers 3 and 4 [3] are not necessary to the opinion and will be disregarded as surplusage and not within the pleadings or issues joined at trial.

Reversed and remanded to enter judgment not inconsistent with this opinion.

STEVENS, C. J., and CAMERON, J., concur.

struction of the said turnout structures is lawful. 2. That the plaintiffs have sustained no legal damages by reason of the construction, operation and maintenance of the said turnout structures. * * * 5. That defendant, as the owner of the patented land above described, has a lawful right to construct a levy upon the northerly boundary of his said property. 6. That under the facts of this case, the construction and maintenance of the said levy upon the northerly boundary of the property of defendant has not resulted in any lawfully compensable damages on the part of the plaintiff. 7. That as between plaintiffs and defendant, defendant has a lawful right to continue to artifically maintain

and control the water level of Cibola Lake.

3. CONCLUSIONS OF LAW: 3. That under the facts of this case the defendant, in the construction of a levy across the southwesterly boundary of the lake, was lawful, and its continued maintenance is lawful. 4. That plaintiffs have sustained no legal damages by reason of the construction and maintenance of the said southwesterly levy.

