IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**HOPI TRIBE,**
*Plaintiff/Appellant,*


*v.*


**ARIZONA SNOWBOWL RESORT LIMITED PARTNERSHIP, ET AL.,**
*Defendants/Appellees.*

———————

No. CV-18-0057-PR
Filed November 29, 2018

———————

Appeal from the Superior Court in Coconino County
The Honorable Mark R. Moran, Judge
No. CV2011-00701
**AFFIRMED**

Opinion of the Court of Appeals, Division One
244 Ariz. 259 (App. 2018)
**VACATED AND REMANDED**

———————

COUNSEL:

Martin P. Clare, Campbell, Yost, Clare & Norell, P.C., Phoenix; and Michael D. Goodstein (argued), Anne E. Lynch, Hunsucker Goodstein PC, Washington, DC, Attorneys for Hopi Tribe

Paul G. Johnson, Scott F. Frerichs, John J. Egbert (argued), Jennings, Strouss & Salmon, P.L.C., Phoenix, Attorneys for Arizona Snowbowl Resort Limited Partnership

John A. Klecan (argued), Renaud Cook Drury Mesaros PA, Phoenix; and Kathleen L. Wieneke, Wieneke Law Group, P.L.C., Tempe, Attorneys for City of Flagstaff

Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Amicus Curiae Goldwater Institute

JUSTICE PELANDER authored the opinion of the Court, in which VICE CHIEF JUSTICE BRUTINEL and JUSTICES TIMMER, GOULD, and LOPEZ joined.  CHIEF JUSTICE BALES, joined by JUSTICE BOLICK, dissented.

———————

JUSTICE PELANDER, opinion of the Court:

¶1        Private parties may bring public nuisance claims in Arizona if the alleged nuisance caused the plaintiff special injury, meaning "damage [that is] different in kind or quality from that suffered by the public in common."  *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 5 (1985).  Today we hold, as a matter of law, that environmental damage to public land with religious, cultural, or emotional significance to the plaintiff is not special injury for public nuisance purposes.

**I.**

¶2        The use of reclaimed wastewater for snowmaking on northern Arizona's San Francisco Peaks has been extensively debated and litigated.  This case is the latest chapter of that dispute.  Over sixteen years ago, the City of Flagstaff contracted to sell reclaimed wastewater to Arizona Snowbowl Resort Limited Partnership ("Snowbowl") for artificial snowmaking at its ski area on the Peaks.  Because the Peaks are located on federal land, this prompted the United States Forest Service to conduct a lengthy environmental impact inquiry, culminating in that agency's approval.  Thereafter, various tribes (including the Hopi Tribe), environmental groups, and other interested parties unsuccessfully challenged the proposed snowmaking under several federal laws, including the Religious Freedom Restoration Act ("RFRA") of 1993, 42 U.S.C. §§ 2000bb to 2000bb-4.  *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008) (en banc).

¶3        Following that federal court litigation, Snowbowl, the City, the United States Department of Agriculture, and the Hopi Tribe continued to discuss potential alternatives to reclaimed water.  No agreement was reached, however, and the Tribe persistently alleged that no proposed administrative actions "could mitigate the adverse effects of using reclaimed wastewater for artificial snowmaking at the Snowbowl."  The City also held public hearings on the matter, at which the Tribe and other interested parties voiced their opposition to the use of reclaimed wastewater on the Peaks.  In 2010, the City ultimately voted to proceed with the reclaimed water contract and, after more public comment, denied a motion to reconsider.

¶4        The Hopi Tribe then filed this action in 2011 against the City on various state law grounds, alleging among other things that the City's "sale of reclaimed wastewater to make artificial snow" is a public nuisance that "will result in unreasonable harm to the environment and the Hopi Tribe."  As described in the Tribe's complaint, "[r]eclaimed wastewater is water that has been used and circulated through the City's

municipal water sewer system, has passed through a treatment facility, and meets certain standards." The Tribe further alleged it "has special interests in the environment, including the flora and fauna, of the San Francisco Peaks in the immediate vicinity of the Snowbowl Resort Area." The Tribe also claimed it "will suffer specific injury" from the "runoff, windblown snow, increased unnatural noise, and elevated air pollution [that] will pervade beyond the Snowbowl Resort Area" and into areas the Tribe uses "for ceremonial practices, hunting[,] . . . the gathering of natural resources[,] . . . and utilitarian purposes." For example, "[n]atural resources that the Hopi collect, as well as shrines, sacred areas, and springs on the Peaks will come into contact with the blown reclaimed wastewater," "negatively impact[ing]" the Tribe's use of the wilderness and surrounding areas. More broadly, the Tribe alleged that "the Snowbowl expansion project," "additional traffic," and the very "presence of the Snowbowl Resort" itself will adversely impact the "natural environment" and unduly interfere with the Tribe's cultural use of the public wilderness for religious and ceremonial purposes.

¶5 The City filed a third-party indemnification claim against Snowbowl, which then moved to dismiss the Tribe's public nuisance claim under Arizona Rule of Civil Procedure 12(b)(6), arguing the Tribe's alleged damages do not constitute the "special harm" needed to maintain that claim. The City later joined in that motion, and the trial court granted it, ruling that the Tribe "failed to satisfy the [special injury] requirement on the basis of . . . religious or cultural practices." (In its ruling, entered in August 2016, the trial court noted the uncontested fact that "Snowbowl has used the reclaimed water since 2012.") The court also granted Snowbowl and the City's request for attorney fees under A.R.S. § 12-341.01(A).

¶6 The court of appeals reversed, concluding that "the Tribe has alleged a special injury sufficient to survive the motion to dismiss" because "interference with a place of special importance can cause special injury to those personally affected, even when that place of special importance is upon public land." *Hopi Tribe v. Ariz. Snowbowl Resort Ltd. P'ship*, 244 Ariz. 259, 263 ¶¶ 12–13, 264 ¶ 16 (App. 2018). To support this conclusion, the court relied on *Beatty v. Kurtz*, 27 U.S. 566 (2 Pet.) (1829), which purportedly "emphasi[zed] . . . the emotional, cultural, and religious significance of the cemetery" at issue in that case. *Hopi Tribe*, 244 Ariz. at 263 ¶ 12. The court also vacated the trial court's fee award because "Snowbowl and the City can no longer be deemed the successful parties." *Id.* at 65 ¶ 18.

¶7 We granted review because whether an alleged special injury sufficiently supports a claim for public nuisance is an issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶8        "We review the dismissal of a complaint under Rule 12(b)(6) de novo." *Zubia v. Shapiro*, 243 Ariz. 412, 414 ¶ 13 (2018).  In doing so, we assume as true the complaint's well-pleaded facts and will affirm only if, "as a matter of law[,] [the] plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Fid. Sec. Life Ins. Co. v. Ariz. Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4 (1998).

¶9        Unlike private nuisances, which "'affect[] a single individual or a definite number of persons in the enjoyment of some private right,'" public nuisances are characteristically broad in scope and "encompass[] any unreasonable interference with a right common to the general public."  *Armory Park*, 148 Ariz. at 4 (quoting *City of Phoenix v. Johnson*, 51 Ariz. 115, 123 (1938)); *accord* Restatement (Second) of Torts ("Restatement") § 821B (Am. Law Inst. 1979).  Thus, based on the notion that public rights "are normally enforced only by public authorities," 2 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 403, at 639 (2d ed. 2011), the common law precluded private citizens' actions to abate or suppress public nuisances.  *Armory Park*, 148 Ariz. at 5.

¶10        The modern rule is more relaxed, allowing a private party to make a public nuisance claim if his or her "damage [is] different in kind or quality from that suffered by the public in common."  *Id.*  This so-called "special injury" requirement serves two important functions.  First, it "relieve[s] defendants and the courts of the multiple actions that might follow if every member of the public were allowed to sue for a common wrong."  *Id.*  Second, in keeping with principles of separation of powers and judicial restraint, it ensures that "harm[s] . . . affect[ing] all members of the public equally [are] handled by public officials" rather than by courts in private litigation.  *Id.*; *see also Engle v. Clark*, 53 Ariz. 472, 474 (1939) (rejecting private citizen's action to enjoin a previously declared public nuisance because such duty fell on the state's attorney general "and the other proper public authorities"); Restatement § 821C cmt. b.

¶11        "[T]he question of standing in Arizona is not a constitutional mandate" because Arizona has "no counterpart to the 'case or controversy' requirement of the federal constitution."  *Armory Park*, 148 Ariz. at 6.  Nonetheless, both the trial court and court of appeals framed the special injury issue here as "whether the Tribe sufficiently alleged standing to maintain a common law public nuisance claim."  *Hopi Tribe*, 244 Ariz. at 260 ¶ 2.  That framing is understandable because this Court has equated the special injury requirement with the plaintiff's "standing to bring an action to enjoin a public nuisance."  *Armory Park*, 148 Ariz. at 5; *see also Sears v. Hull*, 192 Ariz. 65, 70 ¶¶ 18–19 (1998).  More precisely, however, special injury is a requisite element of a private plaintiff's prima facie public nuisance claim, *Armory Park*, 148 Ariz. at 5, the other element being an "unreasonable interference with a right common to the general public" that "affect[s] a considerable number of people," *id.* at 4.  Rather than equating special injury with standing to sue, it is more apt to say that if that element is not sufficiently alleged or

4

proven, a private plaintiff's public nuisance claim fails as a matter of law.  *Cf. Borton v. Mangus*, 145 P. 835, 836–37 (Kan. 1915) (stating that, although trial court dismissed public nuisance action "on the ground that the plaintiff lacked legal capacity to sue," he had standing but did not establish any "special damage" from obstruction of public highway and thus failed to "state facts which constitute a cause of action entitling him to relief").

¶12        Solely for purposes of their motion to dismiss, Snowbowl and the City concede the Tribe adequately alleged a public nuisance.  Therefore, without addressing that point, we limit our review to whether the Tribe sufficiently alleged special injury for an actionable public nuisance claim.

**A.**

¶13        Although there is "[c]onsiderable disagreement . . . over the type of injury" that is "sufficient to distinguish [a] plaintiff's injuries from those experienced by the general public," *Armory Park*, 148 Ariz. at 5, generally "[i]t is not enough that [the plaintiff] has suffered the same kind of harm or interference but to a greater extent or degree," Restatement § 821C cmt. b; *see also Ariz. Copper Co. v. Gillespie*, 12 Ariz. 190, 201 (1909) (stating that special injury is "different in kind, and not merely in degree, from that suffered by the public generally").  But "[w]here to draw the line . . . is often a difficult task" because "it is often a mere matter of degree . . . between the more immediate obstruction or peculiar interference, which is a ground for special damage, and the more remote obstruction or interference [that] is not."  *Ariz. Copper*, 12 Ariz. at 201 (quoting *Kaje v. Chi., St. Paul, Minneapolis & Omaha Ry. Co.*, 59 N.W. 493, 493 (Minn. 1894)).  The issue, then, is where that line falls in this case.

¶14        Primarily relying on *In re Exxon Valdez*, 104 F.3d 1196 (9th Cir. 1997), Snowbowl contends that the alleged injury here is to the Tribe's "desire to enjoy 'pristine natural surroundings,'" *see id.* at 1198, which "is a right shared by the public generally." Snowbowl argues that injury is not transformed into "special harm" "[j]ust because [the Tribe's] members . . . wish to access the Peaks for religious reasons" when "others' motivations are environmental or recreational."  The Tribe counters that "the reclaimed wastewater has directly and significantly impeded [its] use and enjoyment of a place of special importance to the Tribe by thwarting [its] religious practices" on the Peaks. According to the Tribe, such "significant interference with its use of sacred places that have formed a central component of its cultural and religious life since before recorded history" constitutes "injury [that] is clearly different in kind [from] that suffered by the public."  The Tribe maintains that recognizing its injury as "special" "fits squarely within long-established Arizona and other applicable precedent," including *Armory Park* and

*Beatty*, and supports its public nuisance claim.[1]

**¶15** We agree with Snowbowl. Contrary to the Tribe's assertion that the place-of-special-importance form of special injury is consistent with Arizona law, the only public nuisance cases in which we have recognized special injury involved property or pecuniary interests not present here. *See, e.g.*, *Armory Park*, 148 Ariz. at 3, 5 (involving trespass upon and resulting injury to plaintiff's interest in land, and finding special damage because defendant's patrons' actions "affected the [plaintiff's] residents' use and enjoyment of *their* real property" (emphasis added)); *Spur Indus., Inc. v. Del E. Webb Dev. Co.*, 108 Ariz. 178, 184 (1972) (injury to plaintiff's pecuniary interest from loss of sales due to defendant's cattle feedlot operation); *Ariz. Copper*, 12 Ariz. at 197, 202 (injury to plaintiff's property and pecuniary interests caused by defendant's depositing of sedimentary matter into river system, resulting in "direct individual injury" to plaintiff's irrigated, cultivated lands and crop-raising). In fact, in *Sears* we relied on *Armory Park*'s property-based description of special injury to conclude that a tribal casino's allegedly substantial, negative impact on the "character and quality of [the plaintiffs'] community"—a place of special importance to the plaintiffs—was, "as a matter of law, not sufficient to establish . . . any special injury." 192 Ariz. at 68 ¶ 6, 70 ¶ 22 (internal quotation marks omitted). We therefore ordered the trial court to grant the defendant Tribe's motion to dismiss the action, including the public nuisance claim. *Id.* at 68 ¶ 7, 73 ¶ 32.

**¶16** The dissent argues that "[t]hese cases do not require that the interest at stake be a property or pecuniary interest." *Infra* ¶ 52. Perhaps not expressly, but they all involved damage to or interference with such an interest and do not support recognizing a new place-of-special-importance category. And we see good reason for generally adhering to a property- and pecuniary-interest-based approach because, unlike the proposed new category, it comports with the underlying, two-part rationale for the special injury requirement. *See supra* ¶ 10.

**¶17** First, because a particular place's religious importance is inherently subjective, *see Navajo Nation*, 535 F.3d at 1070, courts are ill-equipped to determine whether "one form of incidental interference with an individual's spiritual activities" should be analyzed differently from that of another, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988); *accord Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 887 (1990) ("Repeatedly and in many different contexts, we have warned that courts

---

[1] Conduct may constitute "a public nuisance within the concept of tort law, even if that conduct is not specifically prohibited by the criminal law." *Armory Park*, 148 Ariz. at 10. Nonetheless, the Tribe does not allege a public nuisance within the meaning of Arizona statutes that expressly address, define, and proscribe "public nuisance[s]," including a provision that specifically refers to water. *See* A.R.S. §§ 13-2917, 36-601(A)(18).

must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."), *superseded by statute on other grounds*, RFRA, Pub. L. No. 103-141, 107 Stat. 1488, *as recognized in Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015). This renders courts unable to comparatively "weigh the adverse effects" of an alleged interference with a place of religious importance, *Lyng*, 485 U.S. at 449, potentially allowing "every member of the public . . . to sue for a common wrong" when that is precisely what the special injury requirement is meant to prevent, *Armory Park*, 148 Ariz. at 5.

¶18 Second, equally if not more troubling is the effect the place-of-special-importance category would have on the notion that "invasions of rights common to all of the public should be left to be remedied by action by public officials." Restatement § 821C cmt. b; *accord Armory Park*, 148 Ariz. at 5. At its core, the special injury requirement serves a gatekeeping function that prevents courts from deciding issues under the guise of public nuisance claims when such issues are best left to public officials, a pivotal principle in federal cases grappling with religious freedom challenges to public land uses.

¶19 *Lyng* illustrates this well. There, various parties, including "an Indian organization, individual Indians, nature organizations and individual members of those organizations, and the State of California," brought a religious-freedom-based challenge to a proposed road upgrade and timber harvesting in California's Chimney Rock area. 485 U.S. at 443. The plaintiffs claimed that those projects violated their rights under the First Amendment's Free Exercise Clause and various federal statutes. *Id.*

¶20 The United States Supreme Court rejected the challenge, *id.* at 453, despite recognizing that "the logging and road-building projects at issue in th[e] case could have devastating effects on traditional Indian religious practices" that are "intimately and inextricably bound up with the unique features of the Chimney Rock area," *id.* at 451. Even so, the Court reasoned that "government simply could not operate if it were required to satisfy every citizen's religious needs and desires" because what some consider "essential to the[ir] spiritual well-being" will be "deeply offensive, and perhaps incompatible . . . with the tenets of [others'] religion." *Id.* at 452. The Court also emphasized that the judiciary "cannot . . . reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions." *Id.*

¶21 As the Court in *Lyng* observed, "[w]hatever rights the Indians may have to the use of the area, . . . those rights do not divest the Government of its right to use what is, after all, *its* land." *Id.* at 453. Accordingly, the Court declined to give plaintiffs a potentially boundless "veto" or "religious servitude" that "could easily require *de facto* beneficial ownership of some rather spacious tracts of public property." *Id.* at 452–53; *see also Navajo Nation*, 535 F.3d at 1063–64 (upholding governmental action against citizens'

"individual veto" based on "religious beliefs, sensibilities, or tastes" because "giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone"). Although this case does not involve First Amendment or federal statutory claims, it similarly illustrates how the place-of-special-importance category the Tribe urges (and the court of appeals embraced) would essentially empower a lone plaintiff to interfere with decisions by public officials (made here after extensive input from interested parties, including the Tribe) concerning the best use of public lands. Accordingly, we reject that new category because it would contravene, not further, the dual rationales underlying the special injury requirement for public nuisance claims.

¶22        The reclaimed water contract at issue here went through a nearly decade-long review process in which the Tribe participated and actively voiced its opposition. That process included a series of public hearings at which the City considered alternatives to reclaimed water. And after approving the contract with Snowbowl, the City considered, held public comment on, and ultimately denied a motion to reconsider its decision. The U.S. Department of Agriculture and the U.S. Forest Service also conducted inquiries under the National Environmental Procedure Act and ultimately approved the use of reclaimed water for snowmaking on the Peaks. As noted above, *supra* ¶ 2, the federal courts also rejected the claims of the Hopi Tribe and others that the use of recycled wastewater for making artificial snow on the Peaks violates their rights under RFRA and other federal statutes. *Navajo Nation*, 535 F.3d at 1062–63, 1070 (holding that "the diminishment of spiritual fulfillment—serious though it may be—is not a 'substantial burden' on the free exercise of religion," despite plaintiffs' claims that use of reclaimed water "on a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities").[2]

¶23        Aside from its disagreement with the outcome, the Tribe does not allege that any aspect of this process was procedurally flawed or otherwise defective. And despite the Tribe's insistence that it does not seek a "unilateral veto," it concedes that its claim, if allowed to proceed, would require the trial court to "[weigh and balance the equities of] an activity previously approved by other branches of the government." This clearly contradicts the rationale underlying the special injury requirement, and we therefore decline the Tribe's invitation to "[re]consider the benefits and harm" of using

---

[2] Snowbowl and the City do not argue, nor do we hold, that the Tribe's public nuisance claim is barred by issue or claim preclusion principles based on the Tribe's participation in *Navajo Nation* or prior administrative and other governmental proceedings relating to the reclaimed water contract. The court of appeals previously rejected such assertions. *See Hopi Tribe*, 244 Ariz. at 262 ¶ 6. But this history does bear on the rationale for limiting the type of special injury that will support such a claim, so as to allow public officials to handle claims of harm that affect "rights common to all of the public." Restatement § 821C cmt. b.

reclaimed water for snowmaking on the Peaks. Because the Tribe has not presented sufficient reason for departing from the property- and pecuniary-interest-based approach that our case law has followed, we decline to do so here when the Tribe's alleged injury is different in degree, not in kind, and is best addressed by public officials or congressional acts governing the Tribe's use of public lands for religious purposes.

**B.**

¶24        The law of nuisance is aptly described as an "impenetrable jungle" that has been "applied indiscriminately . . . as a substitute for any analysis of a problem." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 86, at 616–17 (5th ed. 1984). Indeed, "some rather fine lines have been drawn" to determine what constitutes special injury, *id.* at 647, often resulting in outcomes that are difficult to reconcile, *see Ariz. Copper*, 12 Ariz. at 202; Restatement § 821C cmt. b (discussing the "difficulty or impossibility of drawing any satisfactory line" for special injury purposes). Thus, limiting special injury to property or pecuniary interests helps prevent "the erosion of any semblance of doctrinal consistency in the common law of nuisance." *Overcash v. S.C. Elec. & Gas Co.*, 614 S.E.2d 619, 622 (S.C. 2005).

¶25        Although the Tribe does not allege it has a property or pecuniary interest in the Peaks or that its open, unfettered access to those public lands has been impaired, it urges us to expand special injury beyond the types of concrete interests involved in our prior cases. To that end, the Tribe contends that *Beatty*, first raised and heavily relied on by the court of appeals, "reveals that special injury may exist where a site with 'emotional, cultural, and religious significance' is damaged." *See Hopi Tribe*, 244 Ariz. at 263 ¶ 12. But contrary to the court of appeals' description of *Beatty*, that case did not involve "a public nuisance suit." *Id.* Rather, it was an action to quiet title in land used as a cemetery and to enjoin the defendants from "dispossess[ing] the plaintiffs and . . . remov[ing] the tomb stones and graves." *Beatty*, 27 U.S. (2 Pet.) at 579–80. To be sure, the *Beatty* Court described the defendants' actions as a "public nuisance," but it did so only in passing and to preface its declaration that the land was "consecrated to [the plaintiffs'] use by a perpetual servitude or easement," *id.* at 584—a property interest not present here. Therefore, unlike the court of appeals, we do not find *Beatty* "analogous" or "support[ive] [of] the Tribe's argument here." *Hopi Tribe*, 244 Ariz. at 263 ¶ 12. Nor, apparently, does the dissent.

¶26        Again departing from the court of appeals, we find *Exxon Valdez* particularly persuasive in refuting the Tribe's alleged special injury. *See Hopi Tribe*, 244 Ariz. at 264 ¶ 15 (finding the *Exxon Valdez* court's reasoning "inapplicable"). The "determinative issue" in that public nuisance case was "whether cultural damage," meaning "injury to [Alaska Natives'] culture or . . . subsistence way of life," caused by the Exxon Valdez oil spill was different in kind from "that suffered by other Alaskans." *Exxon Valdez*, 104 F.3d at 1197–98. Although the Ninth Circuit acknowledged that "the

oil spill affected the communal life of Alaska Natives," perhaps "more severely than other members of the public," the court nonetheless concluded the Natives' injury was different only in degree because "the right to obtain and share wild food, enjoy uncontaminated nature, and cultivate traditional, cultural, spiritual, and psychological benefits in pristine natural surroundings is shared by all Alaskans." *Id.* at 1198 (internal quotation marks omitted).

¶27 Here, the Tribe alleges harm to its "special interests in the environment," including its right to use and enjoy the Peaks in their "unimpaired," "natural condition." But like the Alaska Natives in *Exxon Valdez*, the Tribe shares that right with the public. Indeed, as the Tribe's complaint acknowledges, Congress protected and preserved the land in question "for the use and enjoyment of the American people in such manner as will leave [it] unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a); *accord, e.g.*, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004). This at very least shows that the Peaks are a place of special importance to all Americans, who are entitled to use and enjoy it in a condition "untrammeled by man." 16 U.S.C. § 1131(c). And in light of that broad congressional mandate, we find unpersuasive the court of appeals' distinguishing *Exxon Valdez* based on "the Alaska Constitution reserving the natural resources of the state to the people for common use." *Hopi Tribe*, 244 Ariz. at 264 ¶ 15 (internal quotation marks omitted).

¶28 Although the Tribe does not specifically allege any property interest to support its public nuisance claim, the dissent finds such an interest in federal law. Citing 25 U.S.C. § 3054, the dissent asserts that the Tribe has a "special, distinct, tangible status recognized by federal law and is not shared by the general public." *Infra* ¶ 47. But the Tribe does not allege that the City–Snowbowl contract or the authorized use of reclaimed wastewater on the Peaks has impaired the Tribe's federal statutory rights of access or privacy for traditional, cultural activities. Moreover, the very statute on which the dissent relies provides that "[a]ccess by Indian tribes to National Forest System land under this subsection shall be consistent with the purposes of Public Law 95-341 (commonly known as the American Indian Religious Freedom Act [("AIRFA")]; 42 U.S.C. [§] 1996)." 25 U.S.C. § 3054(b)(3). In *Lyng*, the Supreme Court examined AIRFA and its legislative history and found no "hint of any intent to create a cause of action or any judicially enforceable individual rights." 485 U.S. at 455. *Lyng* also noted that Representative Morris Udall, who sponsored the bill that became AIRFA, "emphasized that [it] would not 'confer special religious rights on Indians,' would 'not change any existing State or Federal law,' and in fact 'has no teeth in it.'" *Id.* (quoting 124 Cong. Rec. 21,444–45 (1978)).

¶29 Still, the Tribe and the dissent insist that *Spur Industries*, *Arizona Copper*, and Restatement § 821C make clear that "[d]egree of [h]arm [c]annot [b]e [i]gnored" and "frequent use of a resource" almost always indicates a "special interest" the public does not share. But we have never held that a common injury may become "special" merely because the party's use of public property is frequent or the degree of harm alleged is

substantial. In fact, the only discussion of degree in *Spur Industries* relates to "[t]he difference between a private nuisance and a public nuisance," not whether degree is relevant to the special injury inquiry. 108 Ariz. at 183. As the Tribe points out, our pre-statehood court said, "it is often a mere matter of degree . . . which is a ground for special damage." *Ariz. Copper*, 12 Ariz. at 201. That statement, however, merely referred to the difference between "immediate" or "peculiar" harm and that which is "remote." *Id.*

¶30        To be sure, *Arizona Copper* quoted other courts' indistinct language suggesting special injury could arise from "personal inconvenience or annoyance," but that case did not extend special injury beyond harm to the plaintiff's property or person. *See id.* at 201–02 (internal quotation marks omitted) (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103 (1866)). Indeed, we later expressly declined to do so in *Sears*. 192 Ariz. at 70 ¶ 22; *cf. Overcash*, 614 S.E.2d at 622 ("[T]he special or particular injury requirement . . . is satisfied only by injury to the individual's real or personal property."). To hold otherwise would strike at the special injury requirement's core.

¶31        The out-of-state cases the Tribe cites to support its special injury allegation are inapposite. Unlike those cases, this case does not involve harm resulting from a complete blockage of, or substantial interference with, access to a cemetery where a plaintiff owns plots or has loved ones buried. *See, e.g.*, *Scruggs v. Beason*, 20 So. 2d 774, 775 (Ala. 1945) (stating defendant completely blocked a public road that was "the only means of entry to and from the graveyard" where plaintiffs' relatives were buried, depriving plaintiffs of the "right to visit, maintain and beautify the graves"); *Connolly v. Frobenius*, 574 P.2d 971, 979 (Kan. Ct. App. 1978) ("[O]wners of lots in a dedicated cemetery . . . [could] seek relief from any unauthorized use to be made of the cemetery."); *German Evangelical St. Marcus Congregation of St. Louis v. Archambault*, 404 S.W.2d 705, 706–07 (Mo. 1966) (recognizing right of plaintiffs who had near relatives buried in graveyard to prevent cemetery's abandonment and "removal of remains of persons buried there").

¶32        The Tribe and dissent's reliance on Restatement § 821C, and particularly that section's comment c, is likewise misplaced. *Infra* ¶ 55. That comment observes that a plaintiff who "traverses [a] road a dozen times a day . . . nearly always has some special reason to do so, and that reason will almost invariably be based upon some special interest of his own." Restatement § 821C cmt. c. But comment c, which has no illustrations and cites no supporting case law, simply concludes that "in determining whether there is a difference in the kind of harm, the degree of interference *may* be a factor of importance that must be considered." *Id.* (emphasis added). The comment's unsupported, abstract generalizations are of little help, particularly when the Tribe (beyond stating that its members go to the Peaks every month for prayers) does not specifically allege how frequently it used the Peaks for religious or cultural purposes.

¶33        In addition, the Restatement makes clear that "[i]t is not enough that [the plaintiff] has suffered the same kind of harm or interference but to a greater extent or

degree." *Id.* cmt. b. That statement, with which we agree, undermines the Tribe's claim of special injury because, as the Tribe's complaint acknowledges, many people "rely on the purity and sanctity of the Peaks," including "several Indian tribes." And, as the Tribe also alleges, "many others . . . repeatedly and consistently voiced [their] opposition to both the sale of reclaimed wastewater and any additional development on the San Francisco Peaks." The Tribe's alleged injury is therefore different only in degree, which does not make it "different in kind or quality from that suffered by the public in common." *Armory Park*, 148 Ariz. at 5. Indeed, the Tribe's graphic descriptions of reclaimed wastewater and its effects, as detailed in the complaint and repeatedly emphasized by the dissent, strongly suggest that anyone and everyone who visits the Peaks, not just the Tribe, will suffer substantial environmental harm.

¶34 As explained above, "special injury" in this context is a term of art describing "harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." Restatement § 821C(1); *see Armory Park*, 148 Ariz. at 5. This is different from the colloquial meaning of "special," which often describes something "exceptionally good or precious." *Special*, OxfordDictionaries.com, https://en.oxforddictionaries.com/definition/us/special (last visited Nov. 26, 2018). Thus, declining to recognize alleged harm as "special" does not mean the underlying interest is insignificant or unimportant. Contrary to the dissent's insinuation, we emphasize that our legal conclusion neither disregards nor minimizes the authenticity or meaningfulness of the Tribe's culture, ceremonial practices, or religious beliefs. *Cf. Lyng*, 485 U.S. at 453 ("Nothing in our opinion should be read to encourage . . . insensitivity to the religious needs of any citizen.").

## C.

¶35 The Tribe argues that the special injury requirement applies with less force when, as here, the plaintiff seeks to enjoin the alleged public nuisance. We disagree.

¶36 In analyzing public nuisance claims, no Arizona case has distinguished for analytical purposes actions seeking damages from those seeking only injunctive relief. In fact, in *Armory Park* the plaintiff sought, and the trial court granted, only injunctive relief. 148 Ariz. at 2–3, 10. In affirming the trial court's preliminary injunction, this Court did not apply a lower or different standard for establishing special injury and recognized the two-fold rationale for that requirement in all public nuisance actions. *Id.* at 4–5. But even assuming that the special injury criteria differ for equitable remedies, those criteria are inapposite here—the complaint states that the Tribe is seeking an injunction "or in the alternative, damages."

## III.

¶**37**       For the reasons stated above, we affirm the trial court's judgment in favor of Snowbowl and the City on the Tribe's public nuisance claim, vacate the court of appeals' opinion, and remand the case to the court of appeals to determine whether the trial court's fee award is supportable and appropriate under A.R.S. § 12-341.01(A).  In our discretion, assuming that statute applies, we decline the City and Snowbowl's requests for fees incurred in this Court.

CHIEF JUSTICE BALES, joined by JUSTICE BOLICK, dissenting.

¶38        The issue is whether the Hopi have alleged facts that, if proved at trial, would entitle them to relief for a claim of public nuisance based on Snowbowl's use of reclaimed wastewater on the San Francisco Peaks.  To state a claim, the Hopi need only allege that (1) the use of the wastewater is a public nuisance, that is, an "unreasonable interference with a right common to the general public," *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs.*, 148 Ariz. 1, 4 (1985), and (2) the Hopi suffer a "special injury" from the nuisance, "different in kind" from that experienced by the general public.  *Id.* That the complaint alleges a public nuisance is not disputed.

¶39        Today's majority holds that the Hopi have failed sufficiently to allege a special injury, thus denying them outright an opportunity to prove their claims in court. In so doing, the majority understates the nature of the alleged public nuisance, largely ignores the distinctive harms alleged by the Hopi, and adopts a new rule unduly limiting public nuisance claims.  I respectfully dissent.

**I.**

¶40        Neither the majority nor the appellees contest that the Hopi have sufficiently alleged that the use of reclaimed wastewater on the San Francisco Peaks constitutes a public nuisance.  Although the majority gives little attention to this point, understanding the purported harm inflicted on the public is essential to understanding the particularized harms alleged by the Hopi.  In reviewing a ruling on a motion to dismiss, we assume the truth of all well-pleaded facts in the complaint.  *Zubia v. Shapiro*, 243 Ariz. 412, 414 ¶ 13 (2018).

¶41        As to the public nuisance, the material factual allegations can be summarized as follows.  Due to an ongoing expansion effort, Snowbowl wants to create artificial snow to accommodate an uptick in skiers.  To produce this artificial snow, Snowbowl seeks to use reclaimed wastewater.  The term is self-explanatory: water that has been through the municipal sewer system is put to a second use. Water coming from the sewer system carries what one would normally expect in a sewer, as well as myriad components including pharmaceuticals, legal and illicit drugs, veterinary drugs, hormones, and insecticides.

¶42        When the wastewater reaches the water treatment center, it is subjected to only limited treatment.  Some contaminants are removed, but not all, and the process is not designed to remove all contaminants.  The water is then discharged from the plant and put to its destined use - here, the creation of snow.  The reclaimed wastewater is non-potable (that is, the water is unfit for consumption).

¶43        The reclaimed wastewater is treated at the Rio de Flag Treatment Plant. Studies of reclaimed water from this plant found chemicals that interfere with the basic

biology of wildlife. The wastewater also has elevated nitrogen levels, which contributes to the growth of invasive plant life, possibly choking out native flora, impairing soil fauna, and otherwise affecting the ecosystem.

¶44 Snowbowl will use this water to create snow for skiers. Winds will blow this snow over swaths of land and, come the spring melt, the various compounds in the wastewater will percolate into the soil of the San Francisco Peaks. This allegedly endangers several species already facing extinction and mars an ecosystem unique in Arizona.

## II.

¶45 That is the harm allegedly suffered by the general public - the baseline against which the Hopi's harm is measured. The majority finds that the Hopi have failed to articulate any harm beyond that suffered by the general public - the harm suffered by the Hopi is qualitatively no different than that experienced by a weekend hiker or concerned environmentalist. The majority fails to appreciate that the wastewater will affect the Hopi's use and enjoyment of ancestral lands that have played a central role in Hopi culture and religion since before the Coconino National Forest was of concern to the broader public.

¶46 The Hopi refer to the San Francisco Peaks as Nuvatukya'ovi and hold them out as the single most sacred place in Hopi culture. They are so central to Hopi religious beliefs that they mark a cardinal direction in the Hopi universe. Each month, members of the Tribe go to the Peaks to pray, and during some months, members collect water, herbs, and greens for ceremonial use. These pilgrimages play an essential role in Hopi life.

¶47 The U.S. Forest Service has recognized the Peaks as a Traditional Cultural Property and determined they are eligible for the National Register of Historic Places. In making this determination, the Forest Service recognized that the Peaks contain shrines and other ceremonial locations, provide plant and animal resources necessary for ceremonial use, and contain places related to the legends of the very origin of the Hopi. Further, the Forest Service is required to provide access to National Forest System lands to the Hopi for traditional and cultural purposes, 25 U.S.C. § 3054(a), and upon request from the Hopi, the Secretary of Agriculture may close to public access specifically identified Forest Service land to "protect the privacy of tribal activities for traditional and cultural purposes." 25 U.S.C. § 3054(b)(1). This is a special, distinct, tangible status recognized by federal law and is not shared by the general public. This point is not answered by observing, *supra* ¶ 25, that the Hopi are not denied access to the Peaks. Their rights of access recognize but do not define the Hopi's particular interests, rooted in Hopi tradition and culture. Additionally, whether Congress has recognized a private cause of action or judicially enforceable rights in the American Indian Religious Freedom Act,

*supra* ¶ 28, is not relevant, as those issues are distinct from whether the Hopi have alleged a special injury for the purposes of a state public nuisance claim.

¶48 Before Snowbowl came into existence, the Hopi frequently traveled to and through the area. Now, what the Hopi consider a spiritual birthplace is at the base of ski slopes. Snowbowl seeks to introduce snow created from reclaimed wastewater into this environment. Moreover, prevailing winds will blow the snow well beyond the boundaries of Snowbowl, covering sacred land, shrines, springs, and other natural resources with the reclaimed wastewater, including its traces of drugs, nitrogen, and other components. This allegedly will destroy the purity of objects used by the Hopi for their traditional ceremonial practices. In the spring melt, sacred springs will be tainted with the melting wastewater, turning formerly pure ceremonial locations into a secondary sewer. Moreover, the myriad chemicals in the water will wreak unknown damage on the local ecosystem, further degrading traditional and sacred Hopi resources and locations.

¶49 In sum, the Hopi face the destruction and desecration of some of their most sacred locations and practices. This is the harm that the majority claims is no different than that suffered by the public at large. *See supra* ¶ 27. But the general public does not have millennia of religious practice in the area that will be covered in a fine film of reclaimed sewage. Nor does the general public have rights of access and use - rooted in Hopi tradition and cultural practices - recognized by federal statutes. The interference with the Hopi's access to and use of the San Francisco Peaks, as well as surrounding lands affected by windblown or melting snow, is an injury different in kind from that suffered by the public generally.

### III.

¶50 In disregarding the Hopi's claims, the majority creates a new rule, without precedent in our jurisprudence. Although this will ease the judiciary's line-drawing problem in future cases, it undermines the purpose of the public nuisance claim.

¶51 At common law, private parties were prohibited from bringing claims for public nuisance. *Armory Park*, 148 Ariz. at 5. Modern law, and our own case law, are more forgiving, allowing private parties to bring a public nuisance claim so long as they show a special injury - damage "different in kind or quality from that suffered by the public in common." *Id.* Until today, the requisite special injury could come in various forms. The majority, however, declares that, apart from personal injuries, only injuries to property or pecuniary interests will suffice. *See supra* ¶ 23.

¶52 We have long recognized that special injury, required in cases seeking either damages or injunctive relief, can take various forms. *See, e.g., Sears v. Hull*, 192 Ariz. 65, 70 ¶ 19 (1998); *Armory Park*, 148 Ariz. at 5; *Spur Indus., Inc. v. Del E. Webb Dev. Co.*, 108 Ariz. 178, 184 (1972); *City of Phoenix v. Johnson*, 51 Ariz. 115, 123–24 (1938); *Ariz.*

*Copper Co. v. Gillespie*, 12 Ariz. 190, 201 (1909). These cases do not require that the interest at stake be a property or pecuniary interest.

¶53　　　　To make its nascent view of the special harm inquiry appear more established, the majority points to our decision in *Sears* as an example applying a property-based approach. *Supra* ¶ 15. But such a rule was neither mentioned nor created in *Sears*, and our disposition of the nuisance claim in that case dealt with a combination of geographical remoteness (which the Hopi do not have here) and the lack of a harm beyond that suffered by the general public. *Sears*, 192 Ariz. at 69–70 ¶¶ 17–22.

¶54　　　　Moreover, while hornbook law identifies three categories of special harm (personal injury, substantial interference with the plaintiff's use and enjoyment of their own land, and pecuniary loss), this classification system is meant to facilitate discussion and is not exhaustive. *See* Prosser & Keeton § 90, at 643, 648–50. This Court long ago recognized that "no general rule can be laid down." *Ariz. Copper*, 12 Ariz. at 201. All that is required, and easily met by the Hopi here, is distinct and tangible harm. Slamming the courthouse door shut on those whose claims do not involve their own land or money, or personal injury, is not supported by our caselaw and unduly limits the public nuisance doctrine.

¶55　　　　Nor is the majority's new rule supported by the Restatement. Although the Restatement remarks on the difficulty of line drawing in the public nuisance context, Restatement § 821C cmt. b., it does not include the limitation on actions the majority announces today. The majority also misapprehends the significance of comment c to Restatement § 821C, which observes that a plaintiff "who traverses a road a dozen times a day…nearly always has some special reason to do so, and that reason will almost invariably be based on some special interest of [their] own." *Id.* cmt. c. The majority dismisses the Hopi's interest as based only on the frequency of use, since both the public and other Indian tribes also rely on the "sanctity and purity of the Peaks." *Supra* ¶ 33. What the Hopi actually argue, however, is that their frequent use is indicative of their special interest - which comports with comment c. That is, that the Hopi so often visit and traverse the San Francisco Peaks is evidence of how strong their connection to the area is, and how deeply they are injured by Snowbowl's use of reclaimed water. That others may also have interests that are harmed by the use of the wastewater does not imply that the Hopi's interest is no different in kind from that suffered by the general public. *See Ariz. Copper*, 12 Ariz. at 205–06 (recognizing that farmer using irrigated water could sue under public nuisance doctrine for defendant's depositing mining sediment that damaged alfalfa farming generally in Upper Gila Valley).

## IV.

¶56　　　　Based on the allegations of the complaint, Snowbowl's use of reclaimed wastewater to create artificial snow will allow it to increase the number of skiers it can

accommodate while imposing a nuisance on the public by polluting the land and waters of the San Francisco Peaks. The Hopi allegedly will face compounded harm, as their sacred sites, springs, and rituals will be tainted by sewer snow, destroying their religious and cultural use and forcing the Hopi to relocate their practices beyond their traditional homes yet again. The majority observes that the Hopi have challenged Snowbowl's actions in multiple litigation over many years, but that fact does not suggest that their claims here fail, as a matter of law, to state a claim for relief. The Hopi may not be able to prove that the use of the wastewater constitutes a nuisance or that they have suffered the particular injuries alleged; prior litigation may also have some issue preclusive effect here. Thus, holding that the Hopi have stated a claim does not mean they will prevail; if they are to lose, however, it should be on the merits and not by implausibly asserting that they have alleged an injury no different than that suffered by the general public.

¶57            Ironically, if the Forest Service allowed the Hopi to sell pine boughs, pinon nuts, or native tobacco collected from the Peaks (it does not), the majority's holding would allow the Hopi to bring a public nuisance claim based on injury to their pecuniary interests. We may live in a material world, but it is a sad comment on our law to suggest that other interests - such as religious traditions and practices manifest through millennia and recognized by federal law - cannot support a claim of special injury for purposes of the public nuisance doctrine. I respectfully dissent.